## MISSOURI, KANSAS & TEXAS RAILWAY COMPANY OF TEXAS v. ROLAND M. SIMMONS.

### No. 1391.

**1. Pleading—Damages for Personal Injury.**

A petition in a suit for personal injuries specified, among the items of damages claimed, "For necessary medical attention for which he created liabilities as follows: $250 for doctors' bills and $100 for drugs and medical bills." This was sufficient, without specifying dates, amounts and items. A special demurrer was, properly overruled, and evidence of the various items properly admitted.

**2. Improper Evidence—Withdrawal.**

Evidence of impairment of mind, admitted over defendant's objection, the jury were afterwards instructed to disregard, because not alleged. If there was. error in its admission, it was not cause for reversal when the evidence was so with-. drawn and the verdict did not appear large.

**3. Damages—Evidence—Permanent Injury—Expectation of Life.**

See opinion for evidence held sufficient proof of permanent injury to form a. basis for introduction of evidence of plaintiff's expectancy of life.

**4. Railway Company—Passenger—Who Is.**

One who has entered a railway passenger coach after the train is made up and' ready, for the purpose of taking passage thereon, intending to pay fare and being prepared to do so, is a passenger, though he has not procured a ticket. See charge on this subject held proper, and evidence held sufficient.

**5. Charge—Assuming Negligence.**

A charge that under certain supposed facts, plaintiff would be a passenger, "and defendant would be liable for injury to him because of the negligence of its employes," does not assume that defendant's employes were negligent.

**6. Charge—Hypothetical—Insufficient.**

A charge which attempts to direct the jury as to the law applicable to the particular facts in the case should include in its statement of the facts requiring a given finding every hypothesis, supported by the evidence, which would require such finding  See charges, as to what results of negligence would be considered remote, held insufficient in this particular.

**7. Negligence—Proximate and Remote.**

Injuries received by a passenger in rendering assistance to those wounded in a railway accident—as, from strain in lifting—are not proximate results of the negligence causing the accident. See action in giving and refusing charges held error for failing to include this among the results for which there could be no. recovery.

APPEAL from Travis.   Tried below before Hon. JAS. H. ROBERTSON.

*West & Cochran,* for appellant.—In order for a person to recover as part of his damages the amount expended by him for medical attention and medicines, the same should be alleged with sufficient certainty, as to the persons to whom paid and the items and amounts, so as to give

the defendant an opportunity to take the testimony of such witnesses, if he deems proper to do so.

There being no allegation in plaintiff's petition of loss of memory or impairment of the mind, it was error on part of the court to violate the well settled rule, and permit proof before the jury that loss of memory and impairment of the mind was a result liable to follow injuries to the spine. Campbell v. Cook, 86 Texas, 630.

Proof of the expectancy of life is admissible only in death cases and is not admissible in personal injury cases, and the court erred in permitting plaintiff to prove that his expectancy of life was thirty-six years. Railway v. Douglas, 69 Texas, 699.

The relation of carrier and passenger depends upon a contract, express or implied, and by the laws of this State defendant was required to have its depot and waiting room open for the purpose of enabling persons to contract for carriage upon its trains, and as the undisputed evidence shows that the defendant's depot was open and the agent at his post of duty for more than thirty minutes before the time for the departure of the train, and the evidence further shows that at the time plaintiff entered defendant's coaches, he did so without going to its depot, and before the train was placed in position opposite the platform to receive passengers, therefore, under the law, the relation of carrier and passenger did not exist in this case, and the court should have so instructed the jury, and instructed them that plaintiff was but a licensee on its cars, toward whom defendant was bound to exercise only ordinary care, and the fourth paragraph of the charge should not have been given, but instead, one defining the law as herein set out.

It was error on the part of the court to submit to the jury the issue of negligence as depending upon the question of whether or not the appellant had provided a kind of heater free from defects, that could be used for heating its cars with safety to its passengers, because the undisputed testimony showed that the heater was of a kind universally in use for such purpose, and proven to be the safest and best appliance of the kind, and further shows that this particular heater had been properly constructed and tested, and the only question of negligence in the case was as to its operation; and there being no allegation in the petition charging negligence on the ground of the selection of the heater, it was error on the part of the court to submit this issue, as was done in the 5th, 6th and 8th paragraphs of the charge. Railway v. Hennessey, 75 Texas, 157; Railway v. French, 86 Texas, 96; Railway v. Pool, 31 S. W. Rep., 688; Railway v. Wisenor, 66 Texas, 675.

The charge of the court gave to the jury no correct idea of what is meant by the term high degree of care, required of railroad companies in their relations to passengers. The care required is such diligence and prudent foresight as to possible dangers, and such conduct in avoiding the same, as would be used by a very cautious, prudent and competent person engaged in a like business; and to instruct the jury that the defendant was required to exercise a high degree of care, without telling

them for what purpose the care was to be exercised, and that it was limited to the practical operation of the train, was a meaningless expression. Defendant's special charge No. 5 gave the correct rule, and should have been given to the jury.

The evidence having shown that all of the injuries of which plaintiff complained might have been produced by lifting, and the evidence having shown that the plaintiff lifted at a carriage wheel, and also lifted the wounded man Huff out of the train into the carriage, and from the carriage up stairs to the hotel, it was error on the part of the court to limit the jury to a consideration of lifting at the carriage wheel only as the subject for their consideration in determining whether the plaintiff was injured by the explosion or by his subsequent conduct. If the court's charge was correct as far as it went, the court erred in refusing to give appellant's special charge No. 1, which properly permitted the jury to consider the plaintiff's acts in lifting the wounded man out of the train and into the hotel. Patton v. Rucker, 29 Texas, 406; Railway v. Darlington, 30 S. W. Rep., 251.

The verdict of the jury was without evidence to support it.

The verdict for $455 on the first item was excessive, and not supported by the evidence, and the court should have set aside the verdict on that ground.

The verdict for $2250 on the second item was excessive, and without evidence to support it.

*Fiset & Miller, Fisher & Townes* and *Lanier & Kirby*, for appellee.— Plaintiff is not required to plead his evidence, nor is it proper to do so. The facts which constitute a cause of action are matters of evidence and not of pleading. McCauley v. Long, 61 Texas, 74; Mitchell v. Tel. Co., 5 Texas Civ. App., 527; Russell v. Nall, 79 Texas, 664; Rains v. Herring, 68 Texas, 472.

The allegations in plaintiff's petition were sufficient to let in the evidence objected to because the injuries mentioned by Dr. McLaughlin would naturally and necessarily result to a man in normal condition from the wrongs charged. Campbell v. Cook, 86 Texas, 630; So Relle v. Tel. Co., 55 Texas, 308; Railway v. Durrett, 57 Texas, 48.

If there was error to admit the testimony of impairment of mind, it was remedied by the instruction to the jury not to consider the evidence. Rollins v. O'Ferrall, 77 Texas, 90; So Relle v. Tel. Co., 55 Texas, 308; Railway v. Durrett, 57 Texas, 48.

Where there is some evidence of permanent impairment of earning capacity, proof of life expectancy is relevant and proper. Railway v. Douglass, 69 Texas, 699. If the proof of life expectancy was not strictly applicable to this case, it was a harmless error and no injury could have been done thereby.

One who in good faith boards a passenger train without a ticket, intending to pay his fare to the conductor, becomes a passenger. Railway v. Washington, 30 S. W. Rep., 719; 2 Am. and Eng. Encyc. Law, 744.

The issue as to defendants "providing" and furnishing on the occasion in question, a defective heater, and as to the dangerous nature of same was fully alleged, and the evidence as to the negligence in these regards, as well as in the operation of the heater, was clearly preponderating.

There was no evidence whatever that the injuries plaintiff, a robust man of 160 pounds, suffered, were or reasonably could have been produced by his merely assisting Huff out of the train into the carriage and up to his room at the hotel.

The testimony as to whether plaintiff was injured by the explosion was, to say the least of it, conflicting, and therefore this court will not determine as to its sufficiency to support the verdict.   Sullivan v. Zardeneta, 30 S. W. Rep., 95; Railway v. Ludtke, 3 Texas Civ. App., 308; Yoakum v. Kelly, 30 S. W. Rep., 836; Railway v. Osborn, 26 S. W. Rep., 274; Ins. Co. v. Mfg. Co., 28 S. W. Rep., 910.   Verdict is not excessive. Railway v. Wright, 30 S. W. Rep., 294; Galloway v. Railway, 45 Am. St. Rep., 472.

COLLARD, Associate Justice.—This is an action, by the appellee against the appellant, for damages for personal injuries, alleged to have been received from the explosion of a heating apparatus in one of defendant's passenger coaches, at San Marcos, Texas, January 24, 1894, plaintiff claiming to be a passenger in the act of leaving it at the time of the explosion.   The verdict awarded as damages "for doctors' bills, medicines and loss of time, four hundred and fifty-five dollars, and for physical and mental damages the sum of twenty-two hundred and fifty dollars, for which judgment was rendered, from which defendant has appealed.

We find the facts as follows:

1.   On the morning of January 24, 1894, appellant, in the course of its business as a common carrier of passengers and freight from San Marcos, Hays County, over its railroad extending through Lockhart to Smithville, intended to run a mixed train, consisting of freight cars next to the engine, to which were attached two coaches carrying passengers, the first being what is known as a combination coach, the front end of which was used for express, baggage and mail, and the rear end for passengers, the last, or rear car, being a regular passenger coach in which a heater was placed for the purpose of heating and in which it exploded.

2.   The heater was a Baker heating apparatus constructed in the manner set out in plaintiff's petition.

3.   Prior to the time for the train to leave San Marcos, the rear brakeman was provided with a switch list of the freight cars to be placed in the train, and with this list the brakeman directed the movement of the engine doing the necessary switching; and after doing all this preliminary work, the engine and the freight cars that were to be taken out were coupled to the passenger coaches, an empty box car being attached to the rear passenger coach, moved on the track next to the depot and stopped with the engine in the front part of the train opposite

the depot platform and the rear part of the train extending back behind the platform.

4.   The brakeman with the switch list was required to act as baggage master, and after loading some baggage intended to move the train up opposite the depot for passengers to enter the passenger coaches.

5.   As the train stood, persons could enter the passenger coaches only by getting up from the ground, the steps being some ten or fifteen feet back of the end of the depot platform.

6.   The train left San Marcos every morning, making the trip to Smithville, and returned in the evening and remained in the yards at San Marcos over night.   Defendant had employed a negro porter whose duty it was upon the arrival of trains at night to take charge of the passenger coaches, and clean them up, and to make fires in the morning for use during the day.

7.   The rear coach that had been previously used was heated by ordinary stoves; and it had, on January 22, been sent to Smithville shop for repairs, and was substituted by the coach attached, provided with the Baker heater.

8.   When this coach was received at Smithville, the Baker heater had fire in it, and the heater worked well on the run to San Marcos, and on the succeeding day.

9.   The porter, a negro, was ignorant of the Baker heater; did not know that water was used in connection with it; was unable to read; and the only instructions given to him in reference to it were by the brakeman, who told him that he must not close both doors at the same time, and that if both doors were closed, it was liable to blow up, and to use only hard coal.

10.   On the night of January 22d the porter had permitted the fire in the heater to die out, and started the fire afresh on the morning of January 23d; and fire was kept during the day until its return to San Marcos at night, when the porter again permitted the fire to die out.

11.   During January 23d there was a slow rain until about 8:30 p. m., when a norther blew up; and on the morning of the 24th it was freezing cold, causing the water in the cooler on the cars to freeze.

12.   The porter slept in the car during the night; and on the next morning, 24th, finding no fire in the heater, he started a fire.   He used a poker to break the ice in the coolers, and put in them fresh water.

13.   The porter closed the doors of the coaches, in passing in and out, to keep the cold out; but did not lock them, and had no instructions to lock them.

14.   The time for the train to start for Smithville was about 9 o'clock a. m., and while the train was standing as before stated, Herman Heidenheimer, G. A. Huff, E. Binding, and Otto Rathman came to the depot in one of Kone's carriages, a livery and transfer man; and the first three went immediately into the rear coach; and in a short time appellee Simmons, who had arrived at the depot in Kone's omnibus, went into the rear coach.   Soon after J. L. Story came with Kone, being as

he says a little late, and went at once into the rear coach with Kone, all the parties passing from the ground onto the steps of the coach. All of them but Kone, who transferred passengers to the depot, intended to become passengers on the train, had no tickets, but had money sufficient, and intended to pay their fare to the conductor when demanded.

15. When these persons entered the coach and for some time previous thereto, defendant's ticket office was opened, and the ticket agent was at his post selling tickets and checking baggage of other persons; defendant's waiting room for the accommodation of passengers was opened, and several persons intending to become passengers were waiting there.

16. The parties who, as before stated, had entered the coach, had not notified the conductor of the fact. On account of the extreme cold, the evidence shows they went directly to the car and, finding the door closed but unlocked, they entered without consulting any train employe. Harper, the brakeman, knew that Heidenheimer, Huff and Binding had so entered, seeing them pass through the car after finishing his work in making up the train. He was passing through to the baggage car to discharge his duty as baggage master. He made no objection to their occupying the car; it was, he testified, no part of his duty to look after tickets or passengers.

17. As the morning was very cold, the persons named, after entering the coach, gathered round the Baker heater, and Kone left to have appellee Simmons' trunk checked, Story having gone into the combination car. He says he was late and did not buy a ticket because he had a pass on the road. He had left to go into the combination car and had just got inside when the heater exploded. Kone, the transfer man, who had gone to check plaintiff's trunk, had just reached the waiting room of the depot when the explosion occurred.

18. Over defendant's objections it was proven that plaintiff had expended money and incurred debts for medical attention and medicines as follows: To Dr. Eckhart, $84; Dr. McLaughlin, $45; Dr. Haus, $5; and for drugs and medicines, $25.

19. Over defendant's objection it was proven that plaintiff's life expectancy at twenty-eight years was thirty-six years.

20. The Baker heating apparatus exploded, bursting the drum into a number of pieces, tearing the water closet to pieces, jarring out the window glasses, and tearing the pipes of the heater loose from the wall. Hiedenheimer and Binding were instantly killed; Binding's body thrown into the closet up to his knees; Huff was badly injured, blackened, and wounded in head, and he was blown under a seat; and the door was blockaded with debris, all in the rear coach.

In the combination car, in front of the rear coach, the glass was blown out of the door, the end, and two of the side windows, the glass being blown inwards, and the testimony tends to show that the concussion or shock injured Simmons in the spine, causing the suffering and debility alleged. There is a conflict in the testimony as to whether

plaintiff was injured by the concussion, but the verdict of the jury settled the conflict in favor of the plaintiff, and we think it is so supported by the testimony as that we would not be authorized to declare that the fact was not proved.

The heater was one of the kind in general use on all roads in the United States, including the Pullman Palace cars, reasonably safe and adapted to the purpose of heating passenger coaches, and if properly operated and kept in repair, it would be safe. It is provided with a rubber ball safety valve, the best device for relieving excessive pressure in the heater, and it consists of two plates of brass with a hard rubber ball between them, with a spindle projecting into the opening between the connecting parts of the valve, and is screwed down upon the drum with screws to give the required tension to relieve pressure. If the valve is properly set and adjusted to relieve itself at the proper pressure, it will operate perfectly. It becomes hard by exposure and will not act properly if used too long. The heater is a perfectly safe and suitable apparatus if the safety valve is in order and properly adjusted. In operating it, the water in the drum, which is a reservoir on top of the car, should be up to the filling cock which is in the center of the drum. It has to keep a perfect circulation, and if the water is allowed to get below the pipes that enter at the bottom of the drum, steam will generate, and if the safety valve is not in proper working order, an explosion is likely to occur. If the pipes become clogged by any means and the fire is kept up, circulation will stop, and steam pressure will be created in the drum. Leakage in the pipes will reduce the amount of water, and it has to be watched very carefully to prevent water getting low. If the drafts are not properly attended to, and there is a hot, quick fire, there is danger of getting an excessive pressure. Unless the water in the heater is thoroughly saturated with salt, it will, in very cold weather, congeal or become spongy, and accumulate in a solid mass stopping the circulation. If the salt is properly dissolved, it will not cause a deposit if left any length of time. If there were no safety valve on the drum, there would certainly be an explosion, as an excess of pressure would cause something to burst. Accumulation of pressure, if the fire is allowed to burn, would presently burst the drum; and it is placed on top of the car so that, in case of explosion, it will not injure any person in the car, as it would if explosion occurred inside the car.

The foregoing, as to the heater, is taken from the testimony of A. H. White, the general superintendent of the company that makes the Baker heater, who has been connected with its construction for several years and is familiar with all its parts. He further says, and we see no reason to doubt what he says, "I have known the drum to burst on several occasions; but it could not, if the water was at the proper height, everything properly adjusted, and the circulation perfect. The valve could be so set as not to relieve at any pressure, by screwing down on the screws that hold the plates together. If there is no leakage and the apparatus is in perfect order, it would not require replenishing oftener

than once in two or three days. It should be examined at the end of the route, to ascertain the quantity and height of the water in the drum. If the safety valve becomes corroded or is not properly adjusted, an explosion is apt to occur. There is no steam in the drum if the water is at the proper height. In continuous circulation of water there is shrinkage, and in continuous use there is more or less evaporation which requires that the apparatus be examined once in 24 hours to see that the water is at the proper height. This is done by opening the filling cock. I never knew of the existence of a latent defect that withstood the pressure of two hundred pounds and afterwards developed on a less pressure. These heaters are tested when made at a pressure of two hundred pounds to the square inch. The pipe and drum should remain practically perfect for at least twelve years." The heater was repaired and tested in June, 1893, and at the beginning of the cold season it had been filled with salt water and tested; and up to the time of the explosion it worked properly. The drum, at the time in question, exploded into a number of pieces, and there was testimony tending to show that "one of the valves showed on the inside of it a caustic formation, that had been formed from liquid salt or other foreign substance," and the other valve, the funnel cock through which was pressed into the drum, showed that the vacuum or opening had been closed by a caustic formation, caused by salt water or some other substance of like kind. Rust was discovered on the inside of the pipes that were broken open when they were inspected after the explosion. Upon opening the plug in the heater (two days after the explosion), under the car, some black dirt and rust accumulations came out and some water. As the opening was at the lowest point all the water should have run out if the pipes had not been obstructed; and, as all the water did not run out, the pipe was clogged or obstructed somewhere. One witness testified that the pipe was beyond doubt obstructed somewhere. It seems most probable that the explosion was caused by negligence of the company's porter, in firing up the machine when the pipes were clogged with ice, the water in them having frozen, causing pressure which could not be relieved by the valve, the valve being in such a condition as to fail to relieve. The evidence also tends to show that the explosion was caused by defect in the heating apparatus, failure to clean it and keep the pipes clear of obstructions, and by the negligence of the company in committing its management to a servant that did not understand it, through whose failure to operate it properly and with ordinary skill, the explosion occurred. The testimony tends to show that the explosion was the result of the negligence of defendant and its servants, that plaintiff was injured thereby as alleged in his petition, and that the damages awarded for his injuries are not excessive.

*Opinion.*—Appellant complains that the court erred in overruling the special exceptions to plaintiff's petition because of the insufficiency of

allegations as to items and dates of his claim for doctors' bills and medicines.

The petition specifies damages in these matters as "For necessary medical attention for which he created liabilities as follows: $250 for doctors' bills and $100 for drugs and medical bills." Evidence was admitted to prove specific amounts expended by plaintiff.

1.  We do not think in this kind of a suit, sounding in tort for damages, the plaintiff is required to plead the items of damages with that particularity, specifying dates, persons, amounts and items, that is demanded in a suit on a contract. The general averments in plaintiff's petition were sufficient, without particulars as to items, dates, and persons to whom due, and the specific amount due to each; and these averments authorize the proof.

2.  The court, over objections by defendant, permitted Dr. McLaughlin to testify that neurosis described by him affected the mind generally, produced melancholy and depression, rendering the person apprehensive, and that in some cases insanity was produced by shocks to the nervous system, but as to whether there was liability to loss of memory, he was not able to say. On the next day, during the progress of the trial, the court instructed the jury to disregard the testimony as to impairment of mind and loss of memory, as there were no pleadings justifying it. The appellant assigns as error the admission of the testimony, because there was no allegation in the petition of impairment of mind or loss of memory. The petition alleged that the explosion knocked plaintiff senseless, inflicted wounds and bruises upon his back and spine and head, and seriously and permanently injured him in the neck, head, back, spine and kidneys; that said injuries have seriously and permanently injured his nervous system and especially his back, spine and kidneys, and permanently impaired his capacity for labor; that at the time by reason of his injuries he suffered great and severe physical pain, and mental pain and anguish and has continued so to suffer and will continue to suffer during his entire life. If it be held that the testimony was not admissible under the allegations, we do not see that defendant was prejudiced by it, the court having withdrawn it from the jury. The amount of the verdict, taken in connection with the proof of injury, does not indicate that the jury were at all affected by the testimony. Church v. Waggoner, 78 Texas, 202; Smyth v. Caswell, 67 Texas, 567; 77 Texas, 90.

3.  We cannot see that there was error in admitting proof of plaintiff's life expectancy. There was proof of permanent injury, and the fact proved was admissible to be considered with other proof of the extent and continuation of the injury. Railway v. Douglas, 69 Texas, 699.

The testimony of plaintiff shows that he was just leaving the car in which the explosion occurred. "My impression is," he says, "just as I left the car door an explosion or something occurred; cannot be positive whether it was just then or not. The next thing I remember, I was fully in the other car in a dazed condition. I was just recovering from

a dazed condition, and was in the car in front. How I got there I don't know. By dazed I mean I was in a half conscious condition—semi-conscious; don't remember whether I heard a noise or not; may possibly have heard it. Upon regaining consciousness, or getting out of the dazed condition in the other car, several parties were in there." Other persons were in the car. They went out to assist Huff, who was wounded, and plaintiff helped all he could. Huff was assisted into a carriage and taken to a hotel, plaintiff attending him. He, the plaintiff, says, "After I got to the hotel I felt badly, felt sick and began to experience pain in my back and the back of my head and shoulders, and some slight pains in the hip. The back of my head was cut. I know this because it was bleeding. I discovered blood when I took off my collar. Some one called my attention to it shortly after the explosion occurred. After I regained consciousness, I was excited—felt shocked, jarred, and experienced some pain, some uneasiness, about the body. After we got to the hotel, I went into Huff's room and they were attending to his wounds. Afterwards I went down stairs and commenced feeling worse and worse, and finally went upstairs to bed. Dr. Haus called on me and made three or four visits. He gave me prescriptions and something to rub my back with. I remained in San Marcos from Wednesday until Friday night, and was in bed the whole time. During the time I suffered from excruciating pains in my back and was very uneasy about myself. I did not think at first I was much hurt, but as the pains began to increase I naturally thought I was hurt worse than I at first thought. When I left San Marcos I came here, to Austin, Friday night, and remained here until the next evening, and went to my home in Houston. While here in Austin the pains in my back continued right along, and in going to Houston the jar of the train annoyed me very much and caused the pain to increase; got to Houston Saturday night and went to my home. While in Houston Drs. Eckhart, Larendon and my brother came to see me. Dr. Eckhart came at my request. He put me to quite a number of tests with my clothes off."

He remained in Houston about a week under Dr. Eckhart's treatment; he went then to his sister at Orange, where he remained until March 1st, when he came back to Houston, and Dr. Eckhart treated him again until he came to Austin, about June 1st, when he was treated by Dr. McLaughlin. He felt some better after his stay at Orange. While there he did nothing at all; suffered considerable pain in the back. He was employed as traveling salesman for Von Boeckman. Shortly after his return from Orange, he quit work; was advised to do so. He didn't work, because he was suffering pain and felt sick; made two or three trips on the road, and found he could not do that kind of work; so he gave up traveling and remained in the city, and worked the city trade, where he had an easy position. He worked, when it suited him, from March till June. Didn't feel like work; was suffering; could not sleep at night; was nervous and had no appetite; was suffering from pains in the back, back of the head, nervousness, sleeplessness, lack of appetite;

and was generally broken down. Dr. Eckhart advised him to rest. He came to Austin, and was treated by Dr. Frank McLaughlin until he left, which was about the first to fifth of October. He worked for Von Boeckman in Austin; had to work constantly, early and late; it did not agree with him, and he had to quit. His symptoms and sufferings were of the same character as before. He has not worked since he left Von Boeckman, which was some ten days before he left Austin. He has not worked, because experience showed that if he did he could not get better. He felt better at the time of the trial than he has before. When he felt better he would go to work; would go down; and so he concluded not to work until he recovered. He had worked for Von Boeckman in 1892, and his salary was $100 per month. He has only worked as much as three and one-half, or perhaps four months, since he was hurt in the explosion. Before the hurt his health was good, and his weight was 153 to 157 pounds; and the last time he weighed before the trial, he weighed 131 pounds, but had increased three or four pounds since. The testimony of his physicians tended to show that he was hurt in the explosion, resulting in neurosis, and that it will probably be permanent; that he will have nervous diseases and a weakened spine. "The change in Simmons' appearance, from what it was before he was hurt to what it is now (at the time of trial), is that of a powerful man reduced to a man unable to follow his usual avocations." Clearly, there was testimony that his injuries were permanent and it was not error to admit testimony of his life expectancy.

4. The court charged the jury, among other things: "If you find from the evidence that, at the time plaintiff entered defendant's car, defendant had its train made up and ready for the reception of passengers, and that plaintiff in good faith intended to be a passenger on defendant's cars from San Marcos to Lockhart, Texas, and had in his possession sufficient money to pay for his transportation over defendant's road between said points, and intended to pay defendant's agents on demand for his transportation between said points, then plaintiff was, in contemplation of law, a passenger on defendant's cars, and defendant would be liable for injury to him because of the negligence of its employes." This charge is not subject to the objection made to it by appellant, that it did not instruct the jury as to what would constitute a passenger upon its train. The charge was adapted to the evidence upon the subject, which authorized a finding that plaintiff was such a passenger. Under our statutes one desiring to become a passenger is not bound to procure a ticket, but he may pay his fare to the conductor, the law allowing the carrier to charge one cent per mile more than when a ticket is obtained. Sayles' Civ. Stats., art. 4258b, sec. 9. If plaintiff boarded the car and in good faith, intended to pay his fare to the conductor and was prepared to do so, he became a passenger when he entered the car if it was ready for the reception of passengers. The testimony shows that it was ready for that purpose, at least it is sufficient to support the

verdict that it was.  Railway v. Washington, 30 S. W. Rep., 719; Railway v. Huff, 32 S. W. Rep. 551.

The foregoing charge of the court is not subject to the objection made by appellant that it in effect tells the jury that defendant's employes were negligent.

5.   The testimony showed that after the explosion plaintiff assisted in lifting at a carriage wheel on the ground, and helped to assist Huff to a carriage in order to take him to a hotel, and helped him after reaching the hotel to his room.  On this subject the court instructed the jury that "if he sustained the injuries complained of from lifting a carriage wheel after the explosion of the heater, or from viewing the dead bodies of persons killed in the accident, defendant would not be liable for any injuries that were not the direct and proximate result of defendant's negligence, if any, causing the explosion of the heater"; and as follows: "Before the plaintiff can recover in this case, it must appear from a preponderance of the testimony—(1) That the plaintiff was at the time of the explosion of the heater a passenger on the cars of defendant.  (2) That the explosion of the heater resulted from the negligence of the defendant or its employes in furnishing or operating the heater.  (3) That the plaintiff was injured by the explosion of the heater, and unless such facts have been shown, the jury will return a verdict for defendant.

Defendant requested the court to also instruct the jury "that plaintiff cannot recover in this case for any injury he may have suffered as the result of his own acts after the explosion complained of, and if you believe that plaintiff has sustained any injury which resulted from his own acts subsequent to the explosion in viewing the bodies of the persons killed, or in lifting at a carriage wheel, or assisting the wounded man, or from any other act of his own, then you are instructed not to consider or allow him any damages for injuries received from his own acts after the explosion; and if you believe that all the injuries sustained by him, if you believe he sustained any injuries at all, were brought about by his own acts after the explosion, then you should return a verdict for defendant."

Appellant contends that the court's charge was erroneous in not including as injuries possibly inflicted upon himself the lifting of Huff out of the carriage and from the carriage upstairs in the hotel.

Appellee has stated all the testimony on the subject as follows: "Haas testified that when he saw plaintiff he was assisting Huff, who was hurt, getting him to the hotel.  Huff testified that plaintiff assisted in removing me from the car and taking me to the hotel."  Story testified "after the carriage was prepared, Huff was placed in it by Simmons and Turner.  He was lifted out of the car by them, and carried to the carriage by them.  I am not quite sure they put him in, but they were present.  I don't remember who lifted Huff out of the car from the platform to the ground.  I saw the men come out and Simmons and Turner had charge of Huff on the ground.  Huff's feet were on the ground, but his weight was on the two men who were on either side of him.  Turner and Sim-

mons were not carrying his whole weight. He was standing some of it."
Dr. McLaughlin testified that "A man can hurt his back by lifting. This
is a very common way of producing injuries to the back. An injury to
the back is liable to be spinal if in the spinal cord proper. In this case
I don't know what injured Simmons. I attributed it to some shock, but
of my own knowledge I know not what caused the injury." We think
there was error in the court's charge as given, and in refusing the re-
quested charge which was intended to correct the omission. We do not
say that evidence failed to show that plaintiff was injured by the ex-
plosion which may account for all his symptoms of nervous disease, neu-
rosis and his consequent debility and bad health, but we do say that the
court, having undertaken to particularize the other causes which may
have produced that condition, should have included all the causes in-
cluded by the testimony. The omission of the lifting of Huff after the
explosion and his exertions to assist the wounded man was, under the
circumstances, equivalent to excluding that cause from the considera-
tion of the jury (restricting them to the consideration of the causes
enumerated in the charge) about which there was some testimony that
may have influenced the jury. We do not intend to intimate that it
with all the exertions of plaintiff after the explosion would have been
sufficient to induce the conclusion of the jury that they caused plain-
tiff's injuries or any part of them, but that phase of the case should have
been fully presented to the jury without the omission noticed. The
charge asked would have corrected the omission and it was error to re-
fuse it.

6. Other charges of the court were correct and warranted by the
testimony. We find no error in them under the facts, nor in the refusal
to give other charges asked by defendant. There was testimony to show
that plaintiff's injuries occasioned by the explosion were of a permanent
character.

Because of the error in the charge pointed out, the judgment of the
lower court is reversed and the cause remanded.

*Reversea and remanded.*

Delivered February 12, 1896.

Application for writ of error dismissed.